UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
JOE SURIEL,

                Plaintiff,

    -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. CV-05-1218 (FB)

*Appearances:*
*For the Plaintiff:*
HAROLD SKOVRONSKY, ESQ.
1810 Avenue N
Brooklyn, New York 11230

*For the Defendant:*
ROSLYNN R. MAUSKOPF, ESQ.
United States Attorney
Eastern District of New York
By: KEVIN P. MULRY, ESQ.
Assistant United States Attorney
610 Federal Plaza
Central Islip, New York 11722

**BLOCK, Senior District Judge:**

        Plaintiff, Joe Suriel ("Suriel"), seeks review of the final determination of the Commissioner of Social Security ("Commissioner") that, as of January 2001, he was no longer entitled to disability insurance benefits ("DIB"). Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Because the Administrative Law Judge ("ALJ") failed to develop a full and adequate record, the case is remanded for further proceedings.

# I.

The following facts are taken from the Administrative Record ("A.R."):

On December 8, 1981, Suriel was struck by a car; his injuries were "unusually severe": "His left leg was almost completely amputated and he required reimplantation and extensive surgery repairing soft tissue and skin injuries." A.R. at 214. Suriel's treating physician opined that Suriel's leg would heal, but anticipated a "prolonged healing [process]," A.R. at 212; due to the severity of Suriel's injury, the doctor's "prognosis was guarded." A.R. at 213. Suriel's left leg was realigned and placed in a cast, where it remained for more than 9 months.

On June 30, 1982, Suriel filed an application for DIB alleging that he was unable to work due to his injury; on September 18, 1982, the Commissioner granted Suriel's application ("the 1982 Decision").

On January 25, 2001, the Social Security Administration ("SSA") conducted a continuing disability review based on a December 2000 consultative examination and January 2001 residual functional capacity assessment. The SSA determined that Suriel's medical condition had significantly improved to the degree that Suriel was no longer disabled, and therefore discontinued his DIB.

On February 27, 2001, Suriel applied for reconsideration; that application was denied. Suriel subsequently requested a hearing before an ALJ, which occurred on March 3, 2004.

## A. Medical Evidence

At the hearing, Suriel, appearing *pro se*, testified that he continued to

experience extreme leg, lower back, and neck pain as a result of his injuries; he also asserted that he "sometimes" experienced stomach pain and suffered from nervousness.

The consultative examination from December 2000 indicated that Suriel still had moderate limitations in his ability to stand and walk, but no limitations in bending, sitting, lifting, carrying or reaching. The residual functional capacity assessment from January 2001 stated that Suriel could lift and/or carry up to ten pounds occasionally, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull without limitation; however, Dr. Aldo Vitale ("Dr. Vitale") – Suriel's treating physician from 2002 to 2004 – consistently reported that Suriel was disabled and unable to work. During this period of treatment, medical records indicate that Suriel was involved in another car accident and suffered a twisted ankle on another occasion; the evidence, however, suggests that these injuries were not severe.

Suriel testified that he was unable to walk more than a block or two, had trouble getting up from bed at times, and often needed to lay down with his leg extended because sitting was uncomfortable; despite these asserted limitations, Suriel attended church, had regular doctor appointments, often drove a car, was able to take public transportation, and lived in a third-floor apartment. Suriel further testified that while he attended to his personal needs (i.e, showering, combing his hair, brushing his teeth), he relied on his wife for all the cooking, most of the cleaning, and most of the grocery shopping.

A report from Jose Mejia, a medical assistant from the Sunset Park Medical Center, stated that Suriel suffered from post-traumatic stress disorder, anxiety, and

3

depression as a result of his disabling car accident. Additionally, at the hearing, Suriel testified that he had "a lot of worries," A.R. at 416, and often had trouble sleeping. Suriel further testified that he was not taking any psychological medication, but had been in treatment with a psychologist for over six months; he also stated that he had an appointment with a psychiatrist that day.

The ALJ also heard testimony from an impartial vocational expert to determine whether jobs existed in significant numbers in the national economy that Suriel could perform. The ALJ posed the following set of factors as a hypothetical to the vocational expert: "sedentary work, can lift ten pounds, no climb, no balance, no kneel, no crouch, no crawl. " A.R. at 443. The ALJ added that the sedentary limitation would have "a sit/stand option" where Suriel could change positions every two hours, and that Suriel had no relevant past work history. *Id.* Despite the ALJ's attempts to clarify the sit/stand option, the vocational expert testified, "at the sedentary level, I cannot cite jobs." *Id.*

The ALJ then asked the expert whether Suriel could perform the job of a surveillance systems monitor; the expert responded that this position fell into the sedentary level of exertion, requiring a person to sit for a minimum of six hours. The ALJ persisted: "Are we talking about the same thing?" A.R. at 444. The expert replied, "most of them get a rest period for at least 15 to 20 minutes and then they get a rest period in the afternoon for at least 15 to 20 minutes. They also get a lunch period from one half hour to one hour." A.R. at 444. The expert agreed that this scenario, if it were available, equates to a sit/stand option every two hours. The expert then testified that there are 32,750 jobs in the national economy for a surveillance systems operator, but never specified how many

4

of those positions had a sit/stand option.

**B. The Missing Report**

On January 23, 2004, the SSA subpoenaed medical records from Suriel's treating physician – Dr. Vitale. Although Dr. Vitale forwarded many of his records to the SSA, he advised the SSA on March 2nd, that his formal report was not ready. Noting the importance of this record on the issue of Suriel's exertional limitations, the ALJ advised that she would leave the record open to pursue it: "That report is going to be a very significant item in my determination of what goes on here because what I see here are a whole bunch of maybes and I don't have a whole bunch of concrete stuff that I need. . ." A.R. at 446. The ALJ further advised that, if Dr. Vitale's report indicated different limitations, she would ask the vocational expert for a new opinion based on the altered scenario. Although the ALJ sent a subpoena to Dr. Vitale on March 25th, the record reflects no action to enforce the subpoena or otherwise obtain the report; nor does the record reveal that the ALJ warned Suriel of the consequences of not obtaining the record.

**C. Other Evidence**

Suriel was 48 years old at the time of the ALJ's decision, had a 7th grade education from the Dominican Republic, was a resident of the United States for thirty-one years, and had no relevant prior work history. Suriel completed his applications for benefits in English; however, at the hearing, the ALJ provided a Spanish interpreter as a "convenience[]", A.R. at 400. An agent from DIB who interviewed Suriel in June of 1982 observed no difficulty with his ability to read, write or understand English.

## D. The ALJ's Decision

In a written decision dated June 7, 2004, the ALJ evaluated whether Suriel continued to be disabled under 20 C.F.R. § 404.1594. As an initial matter, the ALJ stated that "every effort had been made to develop the medical history of the claimant" pursuant to 20 C.F.R. § 404.1512, and found that the record was adequate to adjudicate Suriel's claim. A.R. at 14. However, the decision makes no reference to ever receiving or considering a final report from Dr. Vitale.

The ALJ then determined that Suriel had not engaged in substantial gainful activity since December 8, 1981, the date of the onset of his initial disability. She next found that none of Suriel's impairments constituted a *per se* disability under the Commissioner's Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. I. Third, she determined that Suriel's medical condition had improved since the date of the 1982 Decision; in support of this finding, the ALJ relied on medical evidence noting improvement in the motion of Suriel's ankle and foot, reports of Suriel's overall increased mobility, and records indicating that his fractures and ankle had healed. Nevertheless, the ALJ found Suriel's current physical impairments were still severe; she determined, however, that his psychological impairments were not severe.

Next, in light of the December 2000 consultative exam, the January 2001 residual functional capacity, and the vocational expert's testimony, the ALJ determined that Suriel could perform a limited range of sedentary work as a surveillance systems operator. Suriel's treating physician's opinion – that Suriel remained disabled and unable to work – was discounted. Moreover, the ALJ characterized Suriel's allegations regarding

6

his ability to work as "exaggerated." A.R. at 21.

Suriel sought review of the ALJ's decision with the Appeals Council; denial of that request for review rendered the Commissioner's decision final.

## II.

### A. Standard of Review

"In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). The former determination requires the Court to ask, *inter alia*, whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the Court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Towards that end, ALJs must ensure that the crucial factors in their determinations are "set forth with sufficient specificity to enable [a court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

### B. General Legal Standards for Disability Claims

Once disability benefits are granted, the Commissioner may terminate them if she finds that the impairment initially warranting benefits is no longer disabling. *See* 42

7

U.S.C. § 423(f). Such a finding must be supported by substantial evidence (1) that there has been "medical improvement in the individual's impairment[s]" and (2) that, at the time of the determination, the individual is "able to engage in substantial gainful activity." *Id.* § 423(f)(1). Under the Commissioner's regulations, an ALJ must make this determination in accordance with a well-established sequential process:

- Has claimant engaged in substantial gainful activity?

- If not, does claimant have an impairment or combination of impairments which qualifies as a per se disability under the Commissioner's listing of impairments in Appendix 1 of this subpart?

- If not, has claimant experienced medical improvement?

- If so, does claimant's medical improvement relate to his ability to do work?

- If so, are claimant's current impairments in combination nevertheless severe?

- If so, considering claimant's residual functional capacity based on all his current impairments, can he still do past work?

- If not, then considering his residual functional capacity, age, education and past relevant work experience, can claimant do other work?

*See id.* § 404.1594(f). The Commissioner has the burden of persuasion to prove that the individual is currently able to engage in substantial gainful activity. *See Godwin v. Barnhart*, 04 Civ. 2852, 2005 WL 1683538, *8 (S.D.N.Y. July 18, 2005) (citing *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir.1994)).

## C. Duty to Develop Record

Correct application of the sequential process requires a full and complete medical record. *See* 20 C.F.R. § 404.1593. If the record is incomplete, the essentially non-adversarial nature of a benefits proceeding requires the ALJ to affirmatively develop the record. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). Under the regulations, the SSA must develop the plaintiff's "complete medical history" and make "every reasonable effort" to help the plaintiff obtain the required medical reports. *Id.* § 404.1593. Generally, the SSA satisfies its obligation if it makes (1) an initial request for evidence from a medical source and, (2) if the evidence has not been received within 10 to 20 calendar days after the initial request, makes one follow-up request to obtain the medical evidence. *See id.* § 404.1512(d)(1).

However, this affirmative duty is heightened in cases involving *pro se* plaintiffs, *see Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996), and is further enhanced when the record sought is that of a treating physician. *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999) ("The ALJ's responsibility to assist a claimant in obtaining her medical records carries particular importance in light of the well-established treating physician rule, which requires an ALJ to grant special deference to the opinions of a claimant's treating physician."). "Reasonable efforts" in this context entails more than merely twice requesting medical reports from treating physicians; it includes issuing and enforcing subpoenas requiring the production of evidence, and advising the plaintiff of the importance of the evidence. *Jones*, 66 F. Supp. 2d at 538-539 (citing *Almonte v. Apfel*, 96 Civ. 1119, 1998 WL 150996, at *7 (S.D.N.Y. March 31, 1998)). The ALJ must also enter these attempts at

evidentiary development into the record. *Id.*

Finally, this enhanced duty to develop the record also requires an ALJ to affirmatively investigate the disabling effects of an impairment if the record contains evidence indicating that such an impairment might currently exist. *See Ferraris v. Heckler*, 728 F.2d 585, 587 (2d Cir. 1984). "This obligation is triggered without regard to whether the claimant has alleged that particular impairment as a basis for disability." *Prentice v. Apfel*, 11 F. Supp. 2d 420, 426 (S.D.N.Y. 1998).

## III.

Suriel argues, first, that there is insufficient evidence that he is literate in English, and second, that there is insufficient evidence that he is able to perform any work existing in the national economy.

### A. English Literacy

Suriel's first contention merits little discussion. The sole basis for contention is that a Spanish interpreter was present at the hearing; however, the record reflects that the interpreter was provided by the ALJ simply as a "convenience," A.R. at 400, not at Suriel's request. Moreover, there is ample evidence that Suriel is able to communicate in English: he completed his benefits applications in English and a SSA interviewer noted no problems with his proficiency in English.

### B. Ability to Perform Work Existing in the National Economy

The ALJ's determination that Suriel could perform work existing in the national economy was based solely on her conclusion that he could work as a surveillance systems operator. On that issue, the vocational expert's testimony is unclear; the record

reflects an awkward and forced interplay between the vocational expert and the ALJ, ultimately resulting in an ambiguous agreement between them. *Lugo v. Chater*, 932 F. Supp. 497, 504 (S.D.N.Y. 1996) (remand where the exchange between the ALJ and the vocational expert was "hopelessly muddled, forming an unacceptable basis for the ALJ's decision regarding [*pro se* plaintiff's]... capacity for substantial employment."). However, even if the vocational expert determined that Suriel could do the work of a surveillance systems operator, the expert never identified the number of those positions with a sit/stand option.

It is ultimately unnecessary to decipher the meaning of the vocational expert's testimony because there is another, more fundamental defect in the ALJ's determination given the inadequate record.

## 1. Dr. Vitale's Report

The December 2000 consultative exam and the January 2001 residual functional capacity assessment suggest that Suriel could, in January of 2001, perform at least some types of sedentary work; however, the record is wholly insufficient to assess Suriel's work abilities in March of 2004, because the record lacks Dr. Vitale's report. The ALJ's awareness of this report, Dr. Vitale's consistent diagnoses that Suriel remained disabled, Suriel's testimony concerning his inability to stand, walk, and sit comfortably, and his wife's confirmation of these limitations, triggered a duty for the ALJ to pursue Dr. Vitale's report. *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) ("[T]he duty to develop a full record and to assist a *pro se* plaintiff compels the ALJ... to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.").

To her credit, the ALJ sent Dr. Vitale subpoenas on January 23, 2004 and

March 25, 2004. However, assuming that these subpoenas satisfied the requirement to make two requests as SSA standards require, in this case, the ALJ was required to do more. *See Jones*, 66 F. Supp. 2d at 524 (S.D.N.Y. 1999) (ALJ's compliance with the minimum requirements of the regulations was insufficient to satisfy heightened duty required to *pro se* plaintiff.).

First, both subpoenas generally requested only that "all medical records be produced." A.R. at 353, 377. "When the claimant appears *pro se*, the combined force of the treating physician rule and the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but *also a report that sets forth the opinion* of that treating physician as to the *existence, the nature, and the severity* of the claimed disability." *Peed*, 778 F. Supp. at 1246 (emphasis added). Second, the record lacks any indication that additional efforts were made to obtain Dr. Vitale's report. *Almonte*, 1998 WL 150996, at *7 ("Possible avenues the ALJ could have pursued included subpoena, enforcement of that subpoena, and advice to the plaintiff of the importance of the evidence."); *Rodriguez v. Apfel*, 96 Civ. 1132, 1997 WL 691428, at *5 (S.D.N.Y. June 30, 1997) ("This heightened obligation" in *pro se* cases involves, *inter alia*, the duty to call the claimant's physicians to testify.).

Third, the ALJ did not inform Suriel that she would rule against him if the report wasn't obtained. *See Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990) (ALJ failed to develop the record where ALJ failed to inform claimant of his skepticism of his doctor's claim.). Quite the opposite, the ALJ explained to Suriel that if Dr. Vitale's report included different limitations than those posed to the vocational expert, she would solicit a new

12

opinion from the expert. Additionally, that the ALJ recognized the significance of the report suggests that she would make every effort to obtain it, not that she would rule against Suriel if he did not supply it. Had Suriel been apprised of the ALJ's skepticism, "he, unlike the ALJ, may have been persistent about obtaining the medical records and detailed statement from [his treating physician]." *See Cruz*, 912 F.2d at 12.

It is, of course, entirely possible that such efforts to obtain the report were taken; however, these efforts should have been detailed in the record. *See Jones*, 66 F. Supp. 2d at 524 (citing *Almonte*, 1998 WL150996, at *4.)).

### 2. Possible Psychological Disorder

The ALJ also failed to develop the record by not developing a complete list of Suriel's impairments. A letter from the Sunset Park Medical Center, Suriel's testimony that he had been in treatment there for over 6 months and was also seeing a psychiatrist, and Suriel's subjective symptoms, were sufficient to alert the ALJ that a psychological impairment might have existed. Once alerted, the ALJ's obligation was to explore the nature and extent of these symptoms. *See Cruz*, 912 F.2d at 11-12 (failure to satisfy duty to *pro se* claimant where ALJ did not probe into the severity of claimant's pain and symptoms). The ALJ, however, never questioned Suriel about the severity of his symptoms, nor does the record reflect any attempt to contact the treatment center or his psychiatrist. *Prentice*, 11 F. Supp. 2d at 427 (remanding where ALJ "did not elicit information about the nature or severity of plaintiff's depression from plaintiff's doctors.").

### C. Effect on the Process

The inadequate administrative record calls into question the ALJ's findings

13

in several respects. First, it is possible that a complete record might reveal that Suriel's mental condition qualified as a *per se* disability under the Commissioner's Listing of Impairments. *See* C.F.R. § 404.1594(f)(2); *see* 20 C.F.R. pt. 404, subpt. P, app. I, §§ 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders).

Second, Dr. Vitale's report may have called into question Suriel's current functional capacity, which in turn undermines the ALJ's finding that Suriel's could perform limited sedentary work. *See id.* § 404.1594(f)(4)(6). The vocational expert's testimony is useless if Dr. Vitale's report revealed that the ALJ's hypothetical did not present the full extent of Suriel's impairments. *See De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) ("A vocational expert's testimony" is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job."); *Lugo*, 932 F. Supp. at 503-04 ("Proper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities. . ."). The ALJ implicitly recognized this point when she advised that she would alter the hypothetical if Dr. Vitale's report indicated different exertional limitations than the ones presented.

Correct evaluation of a continuing disability case depends on a full and adequate administrative record. *See* 20 C.F.R. § 1594(f). Without further development of the record, the Court simply cannot determine whether the ALJ's decision that Suriel was no longer disabled was correct.

## IV.

For the foregoing reasons, the case is remanded for further proceedings in

accordance with this Memorandum and Order. On remand, the ALJ must determine a complete list of Suriel's medical impairments. The ALJ should further ensure that the basis for Suriel's residual functional capacity is current. Finally, the ALJ must determine (based, if necessary, on testimony from a vocational expert or other similar evidence) whether, despite all limitations, Suriel can perform work in the national economy.

**SO ORDERED.**

/s/ FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 29, 2006